# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| ALISON GOLDEN, ) | Civil Action No.: 2:12-cv-03513-RMG-BHH |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| vs. ) | **Violation of Title VII** |
| ) | **Sexual Harassment and Retaliation** |
| THE BOEING COMPANY and ) | |
| PDS TECHNICAL SERVICES, INC., ) | |
| n/k/a PDS TECH, INC., ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) | |
| _____) | |

The plaintiff above named, complaining of the acts of the above-named defendants, states as follows:

## PARTIES AND JURISDICTION

1. That the plaintiff is a resident and citizen of the County of Pinellas, State of Florida.

2. That, upon information and belief, the defendant The Boeing Company ("Boeing" or "defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3. That, upon information and belief, the defendant PDS Technical Services, Inc., n/k/a PDS Tech, Inc. ("PDS" or "defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

4. That this court has federal question jurisdiction pursuant to 42 U.S.C. §2000e-2, 42 U.S.C. §2000e-3, 42 U.S.C. §2000e-5 ("Title VII") and 28 U.S.C. §1331.

5. That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, in that pursuant to 28 U.S.C. § 1391(b), the defendants reside and

1

do business in this district, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

6. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below. Moreover, each defendant employed fifteen (15) or more employees at all relevant times as defined by Title VII and, as such, each defendant is an "employer" under Title VII and otherwise subject to said Act.

7. That on or about August 8, 2011, and as result of defendants' discriminatory conduct, all of which is more fully described below, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against defendants alleging discrimination based upon sex and retaliation.

8. That plaintiff received right to sue notices from the EEOC regarding the complaint described above in paragraph 7 on or about September 27, 2012 in regards to the defendant PDS and on or about October 1, 2012 in regards to the defendant Boeing.

9. That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which she received the two notices of right to sue described above in Paragraph 8.

## FACTS

10. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11. That plaintiff was hired by defendant PDS in or around March of 2009 to work as a Configuration Analyst at defendant Boeing's plant in Charleston, South Carolina. In

or around September of 2009, defendant PDS promoted plaintiff to the position of Manufacturing Engineering Technician and, in or around October of 2010, defendant PDS again promoted plaintiff to the position of Design Engineering Technician.

12. That in this latest position plaintiff started out working in building 8820. There plaintiff reported to Heath Olinger ("Olinger"), a Boeing employee who served as a lead. Olinger reported to Harry Harr ("Harr"), the Manager of Design Engineering, who was also a Boeing employee.

13. That sometime in February 2011, plaintiff was moved to a trailer outside of building 8819. There plaintiff reported to Jason O'Day ("O'Day"), a lead employee employed by defendant Boeing. O'Day, in turn, reported to Kathy Laufenberg ("Laufenberg), a manager who was also employed by defendant Boeing.

14. That in the said trailer plaintiff worked in a cubicle with four (4) people. Approximately two (2) weeks after plaintiff was moved to the trailer, O'Day began to sit in plaintiff's cubicle along with his two friends, Steve Capaldi ("Capaldi") and John Tripp ("Tripp"). When O'Day came in the cubicle, he created a seating assignment which placed plaintiff next to him.

15. That throughout plaintiff's entire employment with defendant PDS and at defendant Boeing, plaintiff performed her job duties in an above-average fashion and otherwise maintained an excellent employment record. To this end, plaintiff was never disciplined by PDS or Boeing; she received at least three (3) promotions and pay raises in only a year and a half; and, her supervisors always told plaintiff that she did a good job.

16. That shortly after O'Day began to sit in plaintiff's cubicle, he began to sexually harass plaintiff.

17. That sometime in late February/early March of 2011, plaintiff asked O'Day to train her on IVT software. In response, O'Day sent plaintiff an instant message stating he would get with plaintiff the next day unless plaintiff wanted him to follow her home.

18. That next O'Day advised plaintiff that he wanted plaintiff to train with Tripp and Capaldi on design work. Plaintiff was excited about the training and told Capaldi that she would be training under him. At some point in the discussion Capaldi remarked to plaintiff "Do I have to take you outside and slap you around?"

19. That when plaintiff reported the inappropriate remarks to Laufenberg, Laufenberg simply told plaintiff to try and get along with people.

20. That on or about March 8, 2011 during a meeting O'Day advised plaintiff and others that, if they ever had any issues with him that they needed to come to him and not his manager (Laufenberg).

21. That later that day, O'Day invited plaintiff to happy hour at the Wild Wing Cafe in North Charleston. While there, O'Day told plaintiff that his comment in the meeting earlier that day about not reporting issues to his manager was directed at or meant for her. He also told plaintiff that the people working with her did not like her.

22. That also on this occasion O'Day disclosed personal information about an employee at Boeing named Steve Graham ("Graham") to plaintiff and told plaintiff he moved Graham out of their cubicle because Graham was trying to get close to plaintiff.

23. That on or about March 12, 2011 after work, O'Day sent plaintiff a text message stating that he and another Boeing employee, Matt Coleman ("Coleman"), were downtown. The text message further invited plaintiff to come downtown to party with the two men. O'Day then sent plaintiff a text message advising that he and Coleman were on their way to Summerville and that they were going to come to her house. Plaintiff accepted the invitation

4

simply to try and be friendly and because plaintiff did not want to alienate or anger her supervisor.

24. That on the way to plaintiff's house, O'Day sent plaintiff another text message stating "We're cumming" and asking plaintiff to put her glasses on.

25. That once at plaintiff's house, O'Day repeated to plaintiff that people at work did not like plaintiff and he called plaintiff a "bitch" at least twice. Both times he did so in a serious and aggressive manner.

26. That O'Day then confided to plaintiff that Laufenberg was inappropriately touching men at work. Plaintiff asked Coleman if O'Day's comment about Laufenberg was true and Coleman replied "Yes."

27. That later that evening O'Day told plaintiff that he flirted a lot when he was drunk and then he grabbed plaintiff's arm and tried to pull plaintiff into her bedroom. Of course plaintiff resisted.

28. That on or about March 15, 2011, O'Day sent plaintiff yet another text message this time saying that he was "excited."

29. That on or about March 16, 2011, O'Day invited plaintiff to happy hour at BW3's in the Tanger Outlet Mall in North Charleston, South Carolina to have a going away party for Coleman, who was leaving for Italy. Coleman, Tripp and Capaldi were also present.

30. That during this get together, O'Day again called plaintiff a bitch. Again he did so in a serious and aggressive manner. O'Day then disclosed to plaintiff that Laufenberg had tried to kiss him. This time plaintiff asked Capaldi if O'Day's allegations were true. Capaldi said it was true and that Laufenberg rubbed up against the men at work. Also during the get together O'Day began to accuse plaintiff of having intimate feelings for Coleman.

31. That the following day plaintiff sent O'Day a text message stating she was not interested in an office romance with Coleman but that, instead, plaintiff was only seeking a serious monogamous relationship. In response, O'Day texted plaintiff back stating, if plaintiff wanted a boyfriend, then she should have met him four years ago.

32. That on or about March 21, 2011, O'Day again sent a text message to plaintiff stating words to the effect of "you should have cum," referring to a trip O'Day and Tripp took with their wives. Then he sent a second text message to plaintiff telling her to read his last text "slowly."

33. That on or about March 22, 2011, O'Day sent an instant message to plaintiff from another male employee's computer stating "I really like you. Let's go out and get drinks." Plaintiff accused O'Day of sending the prank message and reasoned with him that the male employee who used that computer would not have sent the message because he was married. O'Day replied "What is it with you and married people?"

34. That on or about March 29, 2011, O'Day made a remark to plaintiff in front of Tripp, along the lines that he better get plaintiff some work to do "before [plaintiff] gets bitchy." Plaintiff became upset and told O'Day that now she just got bitchy. Then O'Day again called plaintiff a bitch – again in an aggressive manner – and he did so in front of Tripp.

35. That during this same conversation, O'Day took away the design training plaintiff was supposed to receive for her job. In response, plaintiff went outside and began to cry. While outside, plaintiff complained to a coworker, John Connolly, and her old manager, Harr, that it felt like O'Day was harassing her.

36. That then plaintiff complained to Laufenberg that O'Day had just called her a bitch. Plaintiff was upset and crying when she made the report to Laufenberg. Plaintiff then asked to be moved away from O'Day because she did not feel comfortable around him.

37. That Laufenberg responded by stating she could not believe O'Day would engage in such behavior; that plaintiff should not have to deal with it; that is was inappropriate; and that she would do what she could to get plaintiff moved.

38. That as a result of the above harassment and discrimination, plaintiff missed work (with approval) from on or about March 30, 2011 through on or about April 4, 2011. Plaintiff returned to work on or about April 5, 2011.

39. That on or about April 6, 2011, Laufenberg had a meeting with plaintiff wherein she told plaintiff that O'Day denied the harassment allegations. Plaintiff reminded Laufenberg that the last incident was the third time O'Day had called her a bitch. Laufenberg replied that she would try and swap plaintiff's seat with Graham in an effort to get plaintiff away from O'Day. However, Graham did not want to move, so the seating arrangement remained unchanged.

40. That at some point that day O'Day emailed plaintiff and said he was sorry.

41. That on or about the morning of April 7, 2011, Laufenberg called plaintiff to a meeting and told plaintiff that she could not be moved, but that she (Laufenberg) was still trying to work things out. O'Day was in attendance at the meeting, along with Nick Sullivan, another lead employee at Boeing. In response, plaintiff told them that she would go anywhere they needed her to go, but that she would prefer to sit in a seat where there were no issues. O'Day was just staring or glaring at plaintiff during this meeting.

42. That approximately an hour later Laufenberg spoke with plaintiff again, this time with no one else present, and she asked plaintiff if plaintiff could sit in her chair for another month, as defendants would be moving into another building after about a month.

43. That at that point plaintiff broke down and began crying and shaking. Plaintiff told Laufenberg that her environment was hostile and that she did not feel comfortable.

Plaintiff also told Laufenberg there were things O'Day had told her about Laufenberg that Laufenberg would not appreciate (referring to the allegations that she sexually harassed male employees).

44. That plaintiff then said she needed to speak with Ethics and make a sexual harassment complaint and that she wanted to go home. Laufenberg told plaintiff to stick around and that she would get plaintiff a meeting with human resources.

45. That accordingly, a meeting was scheduled for 10:00 a.m. that day with Laufenberg and Sue Paisch ("Paisch"), the Director of the department. When plaintiff showed up for the meeting, Laufenberg told plaintiff that she was talking with human resources and that human resources wanted to meet with Laufenberg and Paisch first before meeting with plaintiff.

46. That at around Noon that day plaintiff was called back to the meeting. Laufenberg and Paisch were present. There was no representative from human resources or the Ethics Department present. Plaintiff brought a small list of items she wanted to report which included the sexual harassment complaint against O'Day and the allegations that Laufenberg was sexually harassing male employees there.

47. That however, before plaintiff could again raise these issues, Laufenberg fired plaintiff because, according to Laufenberg, plaintiff was not a team player.

48. That two days before plaintiff's termination, plaintiff had been shown a matrix which rated all the contract workers. Plaintiff was rated at the top and she had previously received awards.

## FOR A FIRST CAUSE OF ACTION:
## VIOLATION OF TITLE VII
## AGAINST BOTH DEFENDANTS
## SEXUAL HARASSMENT/HOSTILE ENVIRONMENT

49. That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 48 hereinabove as fully as if set forth verbatim.

50. That at all pertinent times defendants each employed fifteen (15) or more employees and, as such, each defendant is an "employer" as defined by Title VII, and otherwise subject to the said Act.

51. That defendants' conduct as described above was offensive, unwelcome, and plaintiff so advised defendants.

52. That said harassment described above was based on plaintiff's sex.

53. That defendants' behavior humiliated plaintiff, unreasonably interfered with her work performance, affected the terms, conditions and privileges of her employment and otherwise caused plaintiff severe psychological and physical harm.

54. That defendants' actions as alleged above created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

55. That on numerous and repeated occasions, plaintiff complained about the above-described sexual harassment to defendants and defendants were otherwise on notice that the harassment was occurring as, based upon information and belief, it occurred openly and on a widespread basis at the defendants; the said harasser had engaged in similar behavior with other employees; and, defendants never provided plaintiff with any kind of sexual harassment policy. Moreover, any harassment policy in place by defendants was wholly ineffective, as plaintiff was terminated as soon as she complained about the harassment.

56. That defendants wholly failed to take prompt and effective remedial action to end the harassment, and defendants continued to sexually harass the plaintiff.

57. That the actions of defendants in engaging in offensive verbal conduct, unwanted sexual propositions and conversations, and unwanted touching, constitute discrimination against plaintiff in violation of Title VII and the Civil Rights Act of 1991.

58. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

59. That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendants.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**AS TO BOTH DEFENDANTS**
**RETALIATION**

60. That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 59 hereinabove as fully as if set forth verbatim.

61. That at all pertinent times defendants each employed fifteen (15) or more employees and, as such, each defendant is an "employer" as defined by Title VII, and otherwise subject to the said Act.

62. That as alleged above, plaintiff complained to the defendants on several occasions that she was being sexually harassed and discriminated against because of her sex (or gender).

63. That plaintiff's complaints were made in good faith, and constitute protected activity under Title VII.

64. That shortly after making the said complaints, defendants terminated plaintiff without warning, notice or cause and for false reasons.

65. That defendants terminated plaintiff for making complaints of sexual harassment and discrimination, and for opposing discrimination based upon sex, all of which is in violation of 42 U.S.C. § 2000e-3.

66. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

67. That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendants.

WHEREFORE, as to all causes of action, plaintiff prays for the following relief against defendants: for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the cost and disbursements of this action, including reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper;

        HITCHCOCK & POTTS

        By: *s/A. Christopher Potts*
        Federal ID No.: 5517
        31 Broad Street (P.O. Box 1113)
        Charleston, SC 29401 (29402)
        Telephone: (843) 577-5000
        Fax: (843) 722-8512
        E-Mail: hitchp@bellsouth.net
        *Attorneys for the Plaintiff*

Charleston, South Carolina
December 13, 2012